# UNITED STATES DISTRICT COURT
# DISTRICT OF MAINE

| | |
|---|---|
| **WILLIAM N. COCHRAN**<br><br>PLAINTIFF<br><br>v.<br><br>**CARRINGTON MORTGAGE SERVICES, LLC**<br><br>Defendant | **CIVIL ACTON No.:**<br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT

William Cochran, through counsel, complains against Carrington Mortgage Services, LLC, for failing to properly investigate obvious errors in servicing his mortgage, making material misrepresentations as to the amounts due on his mortgage, wrongfully commencing and maintaining a foreclosure against him and failing to act in good faith in servicing his loan, as follows:

## PARTIES

1) William Cochran is a resident of Kennebunk County, Maine.

2) Carrington Mortgage Services, LLC is an entity headquartered at 1600 South Douglass Road, Suites 110 & 200-A, Anaheim, CA 92806.

## JURISDICTION AND VENUE

3) This Court has jurisdiction pursuant to 28 U.S.C. § 1331 since certain of the claims asserted herein arise under the laws of the United States.

4) The Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367(a).

5) Venue is proper in this Court pursuant to 28 U.S.C.A. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated in this judicial district.

**FACTS**

6) William Cochran is the owner of certain real property located at 22 Marie Street, Winslow, ME, by virtue of a deed from Paul B. Manson and Delia L. Manson to William N. Cochran dated June 6, 2014, and recorded in the Kennebec County Registry of Deeds on June 9, 2014, in Book 11709, Page 18.

7) The purchase of the property was funded through a mortgage loan from People's United Bank. On June 6, 2014, William N. Cochran executed and delivered to People's United Bank a promissory note for $134,900.00 (the "Note").

8) To secure the Note, William N. Cochran granted a mortgage to Mortgage Electronic Registration Systems, Inc., as nominee for People's United Bank, its successors and assigns, in the amount of $134,900.00 dated June 6, 2014, and recorded on June 9, 2014, in the Kennebec County Registry of Deeds n Book 11709, Page 20 (the "Mortgage"). The Note and Mortgage, collectively will be referred to here as the "Cochran Mortgage."

9) Through a series of assignments, Wilmington Savings Fund Society, FSB, as Trustee of Stanwich Mortgage Loan Trust K ("Stanwich") now claims a mortgage interest in the Cochran Mortgage, and is pursuing a foreclosure action against Mr. Cochran in a matter docketed in the United States District Court, District of Maine as 1:23-cv-00133-NT.

10) Defendant Carrington Mortgage Services, LLC ("Carrington") currently has the servicing rights to the Cochran mortgage.

11) Carrington began servicing the Cochran Mortgage in April of 2021.

12) The Cochran Mortgage was in default when Carrington acquired servicing rights to the Cochran Mortgage.

13) Wells Fargo, not named as a defendant, was the servicer of the Cochran Mortgage before Carrington took over servicing.

14) On January 25, 2023, Korde and Associates, on behalf of Carrington, sent William Cochran a Notice of Default and Right to Cure Letter telling him that he owed $19,630.13 on his mortgage and that if he did not pay that amount within 35 days they could begin a foreclosure. A true copy of the letter is attached as Exhibit A.

15) The $19,603.13 figure was incorrect.

16) Carrington's representation that William Cochran some $19,600 was the culmination of over two years of errors by Carrington, and the threatened foreclosure action was, likewise, the culmination of two years of extreme frustration suffered by William Cochran, who had been doing all in his power to explain Carrington's mistakes to them.

**William Cochran Missed Four Mortgage Payments because of the Pandemic, but was Quickly Back on Track**

17) In April, of 2020, while Wells Fargo was servicing the Mortgage, William lost his job, due to conditions caused by the COVID-19 Pandemic and stopped being able to make mortgage payments.

18) From May of 2020 to August of 2020, William missed four (4) payments.

19) William was in constant contact with the then-servicer, Wells Fargo, about his mortgage deficiency and the reasons for it.

20) He quickly applied for and was told he was "in forbearance," by Wells Fargo.

21) After a few months, William got his job back, and he contacted Wells Fargo to resume payments.

22) Wells Fargo, in a letter dated September 24, 2020, offered William a loan modification where the outstanding payments of approximately $5,000.00, (the four missed payments plus the one, pending payment) would be added to the balance of his loan and where his monthly payments would remain about the same as they had been before he fell behind.

23) The letter instructed Mr. Cochran to get the loan modification agreement notarized and returned to Wells Fargo no later than October 9, 2020.

24) It was very hard to connect with a notary in September and October of 2020 in rural Maine.

25) William could not get the modification notarized before the October 9, 2020, deadline stated in the letter. He contacted Wells Fargo and the Wells Fargo representatives told him that he could send in the agreement after the deadline and the modification would be honored and effective.

26) On December 4, 2020, William was able to notarize the Modification Agreement and sent it to Wells Fargo shortly thereafter.

27) Wells Fargo received the signed, notarized, modification agreement.

28) From the time it received the signed, notarized, modification agreement until the time servicing rights were transferred to Carrington, Wells Fargo failed to honor the modification agreement.

29) From August of 2020, until servicing transferred to Carrington, in April of 2021, William made all his monthly payments due to Wells Fargo. Rather than adding the $5,000 to the mortgage balance as it agreed to do, Well Fargo continued to include it as owed on the monthly statements.

30) Sometime in March or April of 2021, servicing rights to the Cochran Mortgage were transferred to Carrington.

### *William Cochran's Balance Suddenly Jumped from $5000 to $11,000, with No Explanation*

31) Wells Fargo's last statement to Mr. Cochran, before servicing was transferred, claimed that Mr. Cochran's balance jumped from around $5,000 to around $11,000 without any explanation.

32) Mr. Cochran's second to last statement from Wells Fargo, dated March 16, 2021, says that he had a balance of $5,311.88.

33) Mr. Cochran's final statement from Wells Fargo, dated April 1, 2021, says that he has a balance of $11,163.74.

34) Mr. Cochran's first statement from Carrington, dated April 14, 2021, says that he has a balance of $10,855.26.

### *William Cochran Tried in Vain, for over a year, to Get the Problem Fixed*

35) Mr. Cochran had only ever missed four mortgage payments.

36) From April 2021 to June 2022, William Cochran made his monthly mortgage payments to Carrington.

37) Carrington would not accept online payments from Mr. Cochran.

38) Each month he would call, speak to an agent for Carrington, explain that there was a problem with his account, explain that Carrington was asking for more money than he owed, explain that he had a loan modification, and then convince the agent to accept his payment.

39) Mr. Cochran sent Carrington letters and emails in 2021 and 2022 asking that they investigate the obvious error in his account.

40) Mr. Cochran sent the letters to the address provided to him by the agents on the phone, who instructed him to send his written communication to the "investigations department."

41) Mr. Cochran also sent several emails to investigators at Carrington, based on instructions given to him on the phone, by Carrington.

42) Each of Mr. Cochran's written communications with Carrington in 2021 and 2022 explains that there was an error in Carrington's reported balance and that Mr. Cochran had completed a loan modification that was in effect.

43) Each time Carrington investigated, prior to July of 2023, they failed to discover the obvious error in his balance and ignored the loan modification agreement.

### A Foreclosure Commences

44) In July of 2022, Carrington stopped accepting payments from Mr. Cochran, as his account was placed into collections or was marked as headed to foreclosure.

45) On January 25, 2023, Korde and Associates, (Korde) on behalf of Carrington, sent William Cochran a Notice of Default and Right to Cure Letter (the "Default Letter") telling him that he owed $19,630.13 on his mortgage and that if he did not pay that amount within 35 days they could begin a foreclosure. A true copy of the letter is attached as Exhibit A.

46) The claim that payments were past due between July, 2022 to January 25, 2023 was created by Carrington because Carrington refused payments.

47) The foreclosure action was also doomed to failure because the Default Notice overstates the amount past-due on the Mortgage, at that time, by at least $5000.00.

48) That foreclosure action was commenced at the direction of Carrington to enforce the rights of the owner of the loan.

49) As noted above, William Cochran only missed four (4) mortgage payments and those four payments were included in the modification agreement. Yet, starting in April of 2021, Wells Fargo, and then Carrington, began misstating Mr. Cochran's past due balance as though he had missed nine (9) or ten (10) payments. That same overstatement of the amount due is

appears to be included in the "cure amount" in the Default Letter that Carrington had Korde send to William.

### The Foreclosure is Doomed to Failure

50) To succeed in their foreclosure, the Defendant must prove that the $19,630.13 they said was due in the Default Letter was the "precise amount that the mortgagor has thirty-five days to pay in order to cure the default" *Bank of Am., N.A. v. Greenleaf*, 96 A.3d 700, 713 (Me. 2014).

51) The $19,630.13 was not the "precise amount" to cure the default because it overstates the amount due by about $5,000.00.

52) The Defendant knew that the $19,630.13 was not the correct amount due from the time the Cochran mortgage was onboarded in 2021 through the communications with Mr. Cochran that continued through July, 2023.

53) In late April of 2023, William Cochran sent Carrington a letter at the address then maintained for receiving Notices of Error and Requests for Information as required by RESPA. A copy of that letter is attached as Exhibit B (the Notice Letter). That address was:

> Carrington Mortgage Services, LLC
> Errors and Information Requests
> P.O. Box 5001 Westfield, IN 46074

54) The Notice Letter, in relevant part, put Carrington on notice of an error with their servicing of the Cochran Mortgage. It explains that Mr. Cochran only ever missed four (4) payments and that Carrington had been, since they took over servicing, trying to collect for ten (10) payments.

55) The Notice Letter, also asks for information and documents. Mr. Cochran says:

> **I would also like some information**. I am asking for:
>
> 1 ) All of the notes of any conversations I had with you when I called and any recordings of those phone calls please.

> 2) All of the other notes you have about my account.
>
> 3) Everything you got in writing from Wells Fargo when you took over servicing my loan.
>
> 4) Every letter or email or other written thing between you and Wells Fargo about my loan.
>
> 5) Please send me an itemized payoff statement.
>
> 6) Please send me the account history of the loan that you got from Wells Fargo and my account history since you took over servicing.
>
> 7) Any documents that show you have operated in good faith with me?
>
> 8) Do you think it's fair to treat borrowers like you've treated me?
>
> 9) Is this how you treat other Mainers?

56) Carrington received the Notice Letter on May 9, 2023.

57) Carrington sent Mr. Cochran a letter, dated, May 10, 2023, which states that they received a letter from him on May 9, 2023, and that they would anticipate completing their investigation by June 22, 2023.

58) Carrington sent Mr. Cochran a letter dated June 22, 2023, indicating that they were still working on their investigation.

### Carrington Admits the Error, but Maintains the Foreclosure

59) In a letter dated July 14, 2023, some sixty-six (66) days after it received the initial letter from Mr. Cochran, Carrington admitted that it had misapplied five payments to his account and that it would respond shortly to correct the error. The letter said:

> We have determined that not all payment transactions that occurred prior to April 13, 2021 by Carrington had been reversed when the due date correction was made. **Carrington had only reversed one (1) of your six (6) payments that had been paid to Wells Fargo and were in the unapplied funds account at transfer**.

> As of the date of this letter, Carrington is in the process of completing any required adjustments. Once adjustments are completed, Carrington will provide a response detailing the actions

60) As of this filing Carrington has not provided Mr. Cochran with a response detailing its actions.

61) As of this filing, Carrington has not provided Mr. Cochran with any of the information he requested in Exhibit B, apart from a payoff statement.

62) Carrington did, however, reduce (without explanation) Mr. Cochran's reported balance sometime in July of 2023. His July 17, 2023, statement reports an amount due balance of $28,445.19; his August 17, 2023, statement reports an amount due balance of $24,221.75. There are no notes or other transactions reported in the August statement that explain the change.

63) Carrington knew or should have been aware that it was collecting the wrong amount from Mr. Cochran before it officially took over servicing of the loan.

64) Mr. Cochran's monthly mortgage payments on the Cochran Mortgage are, and have always been, approximately $1000.00 per month and he only ever missed four payments (before Carrington stopped accepting payments in 2022). There is no conceivable way for his balance to have been over $10,000.00 when Carrington took over servicing.

65) Mr. Cochran told Carrington there was a problem with it trying to collect too much money from him every time he spoke with them.

66) Mr. Cochran, on the advice of the people he spoke to on the phone from Carrington, sent Carrington's "investigations department" multiple letters and emails notifying them of the error.

67) To the extent the address that the phone agents gave Mr. Cochran to report the potential errors is not the address then maintained for reporting errors under RESPA, Mr. Cochran relied in good faith on the directions given to him by Carrington's employees.

68) Even though it knows and has known that there is a fatal error in the Default Letter, the Defendant have not dismissed their foreclosure against Mr. Cochran.

69) Mr. Cochran has suffered from lost sleep, extreme emotional distress, reduced enjoyment of life, strained relations with his family, gripping fear of homelessness, powerlessness, frustration, anxiety, and anger because of Carrington's actions.

70) Mr. Cochran grew up homeless and worked hard through high school, up to this day, to make sure his daughter never suffered the way he did, with instability and homelessness.

71) This ordeal with Carrington has been a nightmare for him. It has brought back the fears and insecurities of his youth that he worked so hard to put behind him.

72) Mr. Cochran has incurred damages including costs of mailings and legal fees to defend against the wrongful foreclosure filed by and maintained by Carrington.

## COUNT I

The Real Estate Settlement Procedures Act (RESPA)

73) Mr. Cochran repeats and realleges the allegations up this point in the Complaint.

74) Mr. Cochran is a "borrower" entitled to the protections of 12 U.S.C. § 2605 and Regulation X.

75) Carrington is a mortgage servicer subject to the requirements of 12 U.S.C. § 2605 and Regulation X.

76) Pursuant to 12 U.S.C. § 2605(k)(1)(E), Carrington had a legal duty to timely "comply with any other obligation found by the Bureau of Consumer Financial Protection, by regulation, to be appropriate to carry out the consumer protection purposes of this chapter."

77) Carrington had a duty of care under 12 U.S.C. § 2605, 12 C.F.R. § 1024.36, and 12 C.F.R. § 1024.35 to acknowledge in writing Plaintiff's QWR/NOEs within five business days and to respond to the QWR/NOE after conducting a reasonable investigation in writing within thirty business days (unless it sought an extension of not more than 15 days).

78) Carrington failed to timely and materially respond to or investigate Mr. Cochran's QWR/NOEs identified in the preceding paragraphs and therefore violated 12 U.S.C. §§ 2605(e), 2605(k)(1)(C), 2605(k)(1)(E).

79) Carrington also had a duty of care under 12 C.F.R. § 1024.36 and 12 C.F.R. § 1024.35 to conduct a timely and reasonable investigation of Mr. Cochran's QWR/NOEs.

80) Carrington failed to timely correct the errors with Mr. Cochran's loan in violation of 12 C.F.R. § 1024.35(a)(A). To this day, in fact, Carrington maintains a foreclosure action on which it cannot prevail based on its errors.

81) Mr. Cochran is entitled to his actual and statutory damages pursuant to 12 U.S.C. § 2605(f) described supra for Carrington's failure to reasonably investigate their QWR/NOEs and correct its errors and mistakes as described herein consistent with its other mandatory duties under RESPA and Regulation X.

82) Carrington has demonstrated a pattern and practice of failing to adequately investigate Mr. Cochran's QWR/NOW letters in this case. Mr. Cochran sent Carrington multiple QWR/NOE letters and only got a response that suggested that had acknowledged their mistake some 18 months after beginning to service the loan, and even then, Carrington has failed to correct the mistake, has failed to dismiss the unwinnable foreclosure after acknowledging that it made errors in accounting for Mr. Cochran's payments.

## COUNT II

The Fair Debt Collection Practices Act (FDCPA)

83) Mr. Cochran repeats and realleges the allegations up to this point in the Complaint.

84) Carrington acquired its interests in the Cochran Mortgage account when it believed the loan was in default and therefore Carrington is a Debt Collector within the meaning of 15 U.S.C. § 1692a(6).

85) Carrington's attempts to collect amounts not owed by Mr. Cochran in its monthly mortgage statements and the Default Letter violate 15 U.S.C. § 1692(e) because they involve the unlawful use of false, deceptive, or misleading representations or means in connection with the collection of the Cochran Mortgage.

86) Carrington has been aware that it sought an incorrect amount in the Default since at least July 17, 2023, and in fact reduced the balances due on the Cochran Mortgage between the July 2023 and August 2023 mortgage statements.

87) Despite having misstated the "precise amount" due in the Default Letter, Carrington has maintained a foreclosure action against Mr. Cochran in violation of 15 U.S.C. § 1692(e) as such a court of action involves the use of false, deceptive, or misleading representations or means in connection with the collection of the Loan.

88) In the alternative, the above allegations show that Carrington has used unfair and unconscionable means to collect or attempt to collect from Mr. Cochran in violation of 15 U.S.C. § 1692(f).

89) Mr. Cochran has suffered actual economic and non-economic damages.

90) The FDCPA provides for statutory damages in addition to actual damages. Mr. Cochran is entitled to his actual damages and statutory damages allowed under the FDCPA.

### COUNT III
Maine's Mortgage Servicer Duty of Good Faith Statute

91) Mr. Cochran repeats and realleges the allegations up to this point in the Complaint.

92) Under 14 M.R.S.A. § 6113, a mortgage servicer must act in good faith, meaning "honesty in fact and the observance of reasonable commercial standards of fair dealing" when servicing mortgage loans, or be subject to statutory damages of up to $15,000, plus actual damages and legal fees and costs to a prevailing plaintiff.

93) Carrington, for the reasons outlined above, has failed to act in good faith in servicing the Cochran Mortgage.

94) Those failures have been ongoing and systematic since the very beginning of its servicing of the Cochran Mortgage. Carrington has:

    a. Repeatedly given William Cochran the wrong address for reporting errors;

    b. Failed to perform reasonable investigations.

    c. Failed to correct errors.

    d. Failed to respond to requests for information and documents or failed to provide timely responses.

    e. Sought to collect amounts not due on the Cochran Mortgage.

    f. Maintained a foreclosure on which it cannot prevail.

95) The Cochran Mortgage is an "obligation" as defined by 14 M.R.S.A. § 6113(C) because it is a debt secured by a mortgage on Mr. Cochran's primary residence.

96) Carrington is servicing the obligation, as defined by 14 M.R.S.A. § 6113(1)(F) because it has taken action to enforce the debt on behalf of the owner of the loan arising under the obligation.

97) Mr. Cochran is an obligor as defined by 14 M.R.S.A. § 6113(1)(D) because he gave a mortgage interest in the mortgage property covered by the Cochran Mortgage.

98) Mr. Cochran has suffered actual damages because he has paid legal fees to defend the foreclosure brought about by Carrington's failure to honor his loan modification and

defending the foreclosure after Carrington was aware, or should have been aware that it was impossible to succeed in pursuing the foreclosure.

## PRAYERS FOR RELIEF

I. As to Count I, Mr. Cochran asks this court to (i) enter judgment in his favor against Carrington for each violation of the RESPA; (ii) award him actual damages, statutory damages, attorney fees and costs as authorized by the RESPA as determined by the Jury; (iii) estop Carrington from asserting that any NOE or RFI letters sent by Mr. Cochran to the postal or email address given to Mr. Cochran to seek redress of his claims of error were not sent to the address maintained for NOEs and RFIs under the RESPA.

II. As to Count II, Mr. Cochran asks this court to (i) enter judgment in his favor against Carrington for each violation of the FDCPA; and (ii) award actual damages and statutory damages, attorney fees, and costs to him as authorized by the FDCPA as determined by the Jury.

III. As to Count III, Mr. Cochran asks this court to (i) enter judgment in his favor against Carrington for each violation of the of the Good Faith Statute; (ii) award actual damages and statutory damages of $15,000, attorney fees, and costs to him as authorized by the Good Faith Statute and as determined by the Jury.

IV. Mr. Cochran also requests judgments for pre-judgment and post-judgment interest at statutory rates in his favor;

V. Mr. Cochran requests such other and further relief as this Court deems just and proper.

## JURY DEMAND

Plaintiff, William Cochran demands trial by jury for all claims and defenses so triable.


Dated: January 22, 2024                                         /s/John Z. Steed, Esq.
                                                                John Z. Steed, Esq. Bar #5399
                                                                Island Justice
                                                                P.O. Box 771
                                                                Stonington, Maine 04681
                                                                john@islandjusticelaw.com
                                                                207-200-7077